UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ROSA CARRION, as surviving spouse and heir of JOSE CARRION, deceased,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA and WILLIAM DODGE,<br><br>Defendants. | Case No. 2:13-cv-00419-RFB-NJK<br><br>**ORDER** |

## I. INTRODUCTION

This is a wrongful death action brought by Plaintiff Rosa Carrion on behalf of her late husband, Jose Carrion, in which Plaintiff seeks damages for the alleged medical malpractice that led to Carrion's death in April 2011. This case is before the Court on two motions filed by Defendants United States of America and Dr. William Dodge: a Motion in Limine to exclude causation opinions of Plaintiff's experts (ECF No. 42) and a Motion for Summary Judgment (ECF No. 44). For the reasons discussed below, the Court denies both motions.

## II. BACKGROUND

### A. Undisputed Facts

After reviewing the parties' motions and the admissible evidence on file, the Court finds the following facts to be undisputed.

On January 14, 2010, Jose Carrion, a 39-year-old man, was examined at the VA Eastern Colorado Health Care Services. At the visit, it was noted that Carrion[1] had a history of tophaceous

---

[1] Unless otherwise noted, all references to "Carrion" are to Jose Carrion. The Court will refer to

gout and that he was being treated with Allopurinol and colchicine, with ibuprofen as needed for acute flare-ups of pain. A blood test was ordered for Carrion at this visit. The results showed elevated levels of creatine kinase, indicating potential muscle injury. Carrion was advised to stop taking colchicine. In a follow-up appointment on March 25, 2010 at the VA Eastern Colorado, it was noted that Carrion's creatine kinase levels significantly decreased.

On approximately March 14, 2011, Carrion was examined at Michael O'Callaghan Federal Hospital (MOFH) in southern Nevada by Dr. Jaya Prasad. Dr. Prasad diagnosed Carrion with chronic tophaceous gout with recurrent attacks and persistent hyperuricemia. Dr. Prasad prescribed the following medications: Allopurinol, Colchicine, Ibuprofen, and Probenecid. Probenecid is a medication that prevents other medications from being eliminated from the body through the kidneys. Dr. Prasad stated that she prescribed it because of Carrion's high uric acid level. Carrion was told to return for a follow-up appointment in two months and that he could come back sooner if he experienced side effects or did not feel well.

On March 29, 2011, Carrion came to the emergency department at MOFH with complaints of left ear pain, sweats, suspected fever, and headache. Dr. Patrick Hsieh diagnosed Carrion with Serous Otitis Media (middle ear fluid) in the left ear, prescribed naproxen, Sudafed, Afrin, and Lortab, and advised him to follow up with the VA clinic in two to three days. Naproxen is a non-steroidal anti-inflammatory drug (NSAID). Its known possible side effects include, but are not limited to, kidney failure, bleeding and ulcers in the stomach and intestine, liver failure, vomiting, and nausea. The plasma half-life of naproxen in the body has been shown to have been significantly extended when it is taken in combination with Probenecid.

On April 1, 2011, Carrion went to the emergency department at MOFH with complaints of subjective fever, vomiting, and body aches. Dr. William Dodge examined Carrion, who reported that he had recently started taking Probenecid. Dr. Dodge ordered blood work to assess Carrion's kidney function as well as a urine analysis, chest x-ray, and EKG. To treat Carrion's symptoms, Dr. Dodge ordered saline (for hydration), Toradol (an NSAID, to treat pain), Reglan (for nausea and vomiting), Benadryl, and magnesium oxide. Carrion's white blood cell, BUN, and creatinine

Rosa Carrion as "Plaintiff."

1  levels were at normal or slightly elevated levels.[2] Carrion's liver functioning tests indicated levels
2  slightly above normal. Carrion's chest x-ray and EKG had normal results. Several hours later, Dr.
3  Dodge met again with Carrion and noted that his vital signs had returned closer to normal levels.
4  Dr. Dodge discharged Carrion that night with instructions to return to see him the following day if
5  vomiting continued, but to return sooner if his symptoms worsened. Dr. Dodge also instructed
6  Carrion to follow up with his primary care provider in three days to discuss his concerns regarding
7  Probenecid.

On April 3, 2011, Carrion returned to the emergency department at MOFH complaining of swelling in his throat, fever, and chills. Carrion was examined by Dr. Christopher David, who ordered an injection of Decadron, a corticosteroid for inflammation. Dr. David diagnosed Carrion with acute pharyngitis, prescribed him doxycycline (an antibiotic) and instructed him to use honey, and discharged him with instructions to return if his breathing or swallowing became problematic or if new symptoms emerged.

On April 5, 2011, Carrion returned to the emergency department with complaints of nausea and vomiting with a bright red color 7 to 8 times. Dr. Dodge examined Carrion and ordered blood work and a CT scan of Carrion's abdomen and pelvis. Dr. Dodge ordered saline (for hydration) and Zofran (for nausea/vomiting). The lab results indicated that measures of Carrion's kidney function were within normal ranges, but that measures of his liver function had significantly changed. Dr. Dodge admitted Carrion to the hospital for further monitoring and stopped all of Carrion's previously prescribed medications. Dr. Dodge did not see Carrion again.

Approximately four hours later, Carrion was examined by Dr. Teresita Harmon, who noted Carrion's lab and CT results and noted that he was to discontinue colchicine and receive Zofran, ibuprofen, and morphine as needed. Carrion's CT results revealed evidence of diverticulitis, but that his lungs were clear (without pneumonia) and that his liver was normal in size and density with no masses. The next day, Carrion's condition was noted as "stable" and his kidney function tests returned results in the normal range. Dr. Harmon decided to discharge Carrion given that his

---

[2] BUN and creatinine levels are used to assess kidney functioning.

dehydration, nausea, and vomiting had resolved. Dr. Harmon prescribed hydrocodone for pain and Phenergan for nausea and vomiting.

On April 10, 2011, Carrion returned to the emergency department with complaints of right groin and leg pain, weakness, chills, and headache. He informed intake staff that he had taken Probenecid earlier that day. Carrion was examined by Dr. Edward Hackie, Jr., who ordered lab work and the administration of Toradol. Dr. Hackie noted that Carrion had elevated liver enzymes and admitted him to the hospital.

Several hours later, Carrion was seen by Dr. Joe Juarez in the hospital. Carrion told Dr. Juarez that he had experienced nausea, vomiting, fever, and ankle pain after initiating Probenecid that day. Carrion also informed Dr. Juarez that he had not had any significant urine output that day. Dr. Juarez noted that Carrion had febrile syndrome and that this could possibly be a reaction to Probenecid. Later that day, at 9:30 p.m., Dr. Juarez noted that Carrion had not urinated since the previous day. At 10:00 p.m., Dr. Juarez noted Carrion had urine output of 200 ml, dark amber in color. At approximately 11:07 p.m., Dr. Eloise E. Guzman was called by nursing staff after Plaintiff reported that Carrion had a 45-second episode of uncontrolled jerking of his extremities. Carrion told Dr. Guzman he was unable to see her hand when asked but that he was able to see light. Dr. Guzman ordered a brain MRI. At approximately 1:45 a.m. on April 11, 2011, Dr. Guzman reviewed Carrion's lab results and assessed that he had renal (kidney) failure/severe metabolic acidosis. Dr. Guzman called in additional staff for intubation, and Carrion was then transferred to the intensive care unit.

At approximately 8:00 a.m., Dr. Cherokoth Verghese took over Carrion's care and evaluated him. Dr. Verghese assessed him as having shock with multisystem organ failure. Dr. Verghese ordered additional consultations to determine the cause of the shock. A nephrology consultation note written by Dr. Reeta Thukral at 12:13 p.m. stated that she had spoken with Plaintiff, who said that Carrion had been using colchicine, Probenecid, and ibuprofen for the past four weeks. Dr. Thukral obtained consent from Plaintiff to perform dialysis on Carrion. At approximately 4:00 p.m., Carrion was in renal failure and receiving dialysis.

1  At approximately midnight on April 12, 2011, Carrion went into repeated cardiac arrest. He was pronounced dead at 1:50 a.m. Carrion's autopsy was performed on April 13, 2011 at 10:00 a.m. The autopsy diagnosis included acute tubular necrosis in the kidneys, mild macrovesicular steatosis in the lever, and hepatocyte necrosis.

### B. Procedural History

Plaintiff filed her initial Complaint on March 12, 2013 and her Amended Complaint on January 13, 2014. ECF Nos. 1, 22. Discovery, which was extended several times, closed on May 17, 2015. ECF No. 40. On June 15, 2015, Dr. Dodge filed a Motion to Strike Plaintiff's Expert Designation of Terrence Clauterie and Dr. John Palmer. ECF No. 41. Also on June 15, 2015, the United States filed a Motion in Limine to Exclude the Causation Opinions of Plaintiff's Medical Experts. ECF No. 42. Plaintiff did not file a response to this motion, despite the Court granting her additional time to do so. On June 16, 2015, Dr. Dodge filed a Motion for Sanctions based upon Plaintiff's alleged spoliation of evidence and a Motion for Summary Judgment. ECF Nos. 43, 44. The United States filed joinders to Dr. Dodge's motions, and Dr. Dodge similarly filed a joinder to the United States' motion. Plaintiff did not file a response to Dr. Dodge's Motion for Summary Judgment.

On March 9, 2016, the Court held a hearing at which it heard representations from Plaintiff's counsel regarding Plaintiff's failure to file responses to the Motion in Limine and the Motion for Summary Judgment. ECF No. 66. The Court directed Plaintiff to file a motion for leave to file a late response to Defendants' Motion in Limine and Motion for Summary Judgment. ECF No. 66. After the filing of the motion, the Court granted Plaintiff an extension of time to file oppositions to the Motion in Limine and Motion for Summary Judgment. ECF No. 70. The Court also denied Defendants' Motion for Sanctions and Motion to Strike Expert Designations, stating that the motions may be reconsidered at Defendants' request following the Court's ruling on the Motion for Summary Judgment. ECF No. 71.

/ / /

/ / /

On July 22, 2016, the Court held a hearing at which it informed the parties that the Motion in Limine and Motion for Summary Judgment were denied and that a written order would follow. This Order sets forth the Court's reasoning for its rulings.

### III.     LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011).

Where the party seeking summary judgment does not have the ultimate burden of persuasion at trial, it "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its [initial] burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. If it fails to carry this initial burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Id. at 1102-03. If the movant has carried its initial burden, "the nonmoving party must produce evidence to support its claim or defense." Id. at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). However, the ultimate burden of persuasion on a motion for summary judgment

rests with the moving party, who must convince the court that no genuine issue of material fact exists. Nissan Fire, 210 F.3d at 1102.

### IV. DISCUSSION

Based on its review of the record in this case, the Court denies Defendants' Motion in Limine to exclude the causation opinions of Plaintiff's expert doctors at this time. The Court also denies Defendants' Motion for Summary Judgment.

#### A. Motion In Limine (ECF No. 42)

In this motion, Defendants raise a Daubert challenge to the causation opinions of Ms. Carrion's medical experts, Dr. John D. Palmer and Dr. J. Marshall Anthony. For the reasons given below, the Court denies Defendants' motion.

##### 1. Applicable Law

"Expert testimony is admissible pursuant to the Federal Rules of Evidence, primarily Rule 702. Under Daubert, the district court acts as a "gatekeeper," ensuring that expert testimony meets the standards of reliability required under Rule 702." Domingo ex rel. Domingo v. T.K., 289 F.3d 600, 605 (9th Cir. 2002) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993)).

Rule 702 "require[s] that expert testimony . . . be both relevant and reliable." Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 463 (9th Cir. 2014) (internal quotation marks omitted). Scientific evidence is relevant if it "logically advance[s] a material aspect of the party's case." Estate of Barabin, 740 F.3d at 463 (quoting Cooper v. Brown, 510 F.3d 870, 942 (9th Cir. 2007)). Scientific evidence is deemed reliable if the principles and methodology used by the expert proffering it are grounded in the methods of science and if the methodology "properly can be applied to the facts in issue." Daubert, 509 U.S. at 592.

The reliability inquiry is "a flexible one" and is concerned "not with the correctness of the expert's conclusions but the soundness of his methodology." Estate of Barabin, 740 F.3d at 463 (internal quotation marks omitted). District courts consider several factors in determining whether scientific testimony meets the reliability requirements of Rule 702, including "(1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has

been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community." Domingo, 289 F.3d at 605 (citing Daubert, 509 U.S. at 593-94). "[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1318 (9th Cir. 1995) ("Daubert II").

Where an expert has not conducted pre-litigation research or subjected his research to peer review, the party seeking to introduce expert scientific testimony can attempt to establish reliability through testimony from the experts themselves. Id. at 1318-19. "For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." Id. at 1319. While it is common for experts to extrapolate from existing data, district courts are not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

### 2. *Plaintiff's Experts' Causation Opinions Are Not Excluded*

Defendants argue that Dr. Palmer's and Dr. Anthony's opinions regarding causation should be excluded on three separate grounds. The Court addresses each in turn.

First, Defendants argue that the causation opinions of Drs. Palmer and Marshall must be excluded because they have not pointed to any evidence that Probenecid causes a fatally toxic buildup in any of the NSAIDs prescribed to Mr. Carrion. But these experts need not point to a study showing that probenecid causes a *fatal* buildup. Under Nevada law, medical causation can be shown through expert testimony that a doctor's "negligent act or omission caused the injuries or reduced a substantial chance for a more favorable recovery." Prabhu v. Levine, 930 P.2d 103, 107 (Nev. 1996). Here, Dr. Palmer cited to a study finding that Probenecid significantly lengthens the amount of time that naproxen stays in the body and that naproxen can "precipitate overt renal decompensation." Dr. Palmer also relied on evidence showing that NSAIDs such as naproxen can

have severe side effects, including kidney failure. Similarly, Dr. Marshall also produced evidence that Probenecid lengthens the time NSAIDs remain in the body and that NSAIDs have many known side effects, including renal injury. Based on this evidence combined with the medical records showing that Carrion experienced kidney failure before death, the Court finds that Dr. Marshall and Dr. Palmer have presented competent testimony that by not instructing Carrion to discontinue Probenecid or NSAIDs, Defendants reduced a substantial chance for a more favorable recovery. As long as this testimony meets the standards of relevance and reliability, whether the jury will credit it is not for the Court to decide at this stage.

Second, Defendants contend that the opinions of Dr. Palmer and Dr. Anthony should be excluded because they failed to use a scientifically valid method, such as differential etiology, to conclude that the interaction between probenecid and NSAIDs caused Mr. Carrion's death. This argument is also unavailing. While the Ninth Circuit has stated that "a reliable differential diagnosis passes muster under Daubert," see Clausen v. M/V New Carissa, 339 F.3d 1049, 1058 (9th Cir. 2003),[3] it has not *required* experts to use that method when reaching their conclusions. Clausen does not state that an expert can never give opinion testimony if he or she has not first done a differential diagnosis or etiology, and Defendants have provided no other binding case law in support of such a principle. While differential diagnosis is one "universally accepted method" for establishing medical causation in certain contexts, id. at 1056, a plaintiff can nonetheless present expert medical testimony that does not include this method provided that it meets Rule 702's threshold reliability requirement. As discussed above, the Court finds this standard to be met here.

Third, Defendants argue that the doctors' opinions are not factually grounded because they did not know the quantity of medication Carrion had actually taken in the days leading up to his death. Defendants continue to rely on the assumption that the experts must opine that Carrion's

---

[3] In order to be reliable, an expert conducting a differential diagnosis must first "rule in" potential causes of an individual's symptoms by determining "which of the competing causes are generally capable of causing the patient's symptoms or mortality." Id. at 1057-58. Then, the expert must "engage in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case. A district court is justified in excluding evidence if an expert utterly fails . . . to offer an explanation for why the proffered alternative cause was ruled out." Id. at 1058 (internal quotation marks omitted) (alteration in original).

NSAID level was fatally toxic in order for their testimony to be admissible as to causation. As discussed above, however, under Nevada law the plaintiff must only prove that the negligent act reduced a substantial chance for a more favorable recovery. See Prabhu, 930 P.2d at 107. There is evidence in the record that Carrion took at least some amounts of Probenecid and NSAIDs in the days leading up to his death, that Probenecid prolongs the duration of NSAIDs in the body, that NSAIDs can cause kidney failure, that Carrion experienced kidney failure, and that the autopsy revealed that Mr. Carrion suffered acute tubular necrosis in his kidneys. The Court therefore rejects this argument and finds the testimony of Dr. Palmer and Dr. Anthony to be sufficiently reliable to be admissible under Rule 702. Defendants' Motion in Limine is denied.

**B. Motion for Summary Judgment (ECF No. 44)**

In this motion, which was filed by Dr. Dodge and joined by the United States, Defendants seek summary judgment on the grounds that Plaintiff has failed to produce any evidence that their actions fell below the standard of care or that Carrion's death was caused by the interaction of Probenecid and NSAIDs. For the reasons given below, the Court denies summary judgment.

***1. Applicable Law***

"To prevail in a medical malpractice action, the plaintiff must establish the following: (1) that the doctor's conduct departed from the accepted standard of medical care or practice; (2) that the doctor's conduct was both the actual and proximate cause of the plaintiff's injury; and (3) that the plaintiff suffered damages." Prabhu, 930 P.2d at 107. To create a question of fact on causation in a medical malpractice case, "the plaintiff must present evidence tending to show, to a reasonable medical probability, that some negligent act or omission by health care providers reduced a substantial chance of survival given appropriate medical care." Perez v. Las Vegas Med. Ctr., 805 P.2d 589, 592 (Nev. 1991); Prabhu, 930 P.2d at 107. Further, "liability for personal injury or death is not imposed upon any provider of health care based on alleged negligence in the performance of that care unless evidence consisting of expert medical testimony, material from recognized medical texts or treatises or the regulations of the licensed medical facility wherein the alleged negligence occurred is presented to demonstrate the alleged deviation from the accepted standard

of care in the specific circumstances of the case and to prove causation of the alleged personal injury or death." N.R.S. 41A.100(1). "Expert medical testimony provided pursuant to subsection 1 may only be given by a provider of health care who practices or has practiced in an area that is substantially similar to the type of practice engaged in at the time of the alleged negligence." N.R.S. 41A.100(2).

### 2. *Summary Judgment Is Denied*

Defendants raise three arguments in their Motion for Summary Judgment. Each is without merit for the reasons stated below. Accordingly, the Court denies summary judgment.

First, Defendants argue that summary judgment should be granted because Plaintiff has not produced an expert who has practiced in an area "substantially similar" to the type of practice engaged in in this case, as required by Nevada law. See N.R.S. 41A.100(2). Defendants argue that under this standard, Plaintiff was required to—and did not—present testimony by an expert with experience in emergency medicine. Instead, Plaintiff relied on the testimony of Dr. J. Marshall Anthony, who is certified in family medicine, an area which Defendants argue is not substantially similar to emergency medicine.[4] The Court disagrees and finds that Dr. Anthony's practice is "substantially similar" to the practice of prescribing medications and monitoring their side effects, which is the practice that allegedly led to the negligence in this case. Defendants do not dispute that Dr. Anthony prescribes medication and is familiar with the interactions of different medications, and they do not identify why Dr. Anthony would need a certification in emergency medicine to be able to opine as to whether Defendants violated the standard of care by not instructing Mr. Carrion to discontinue Probenecid or NSAIDs. See Borger v. Eighth Judicial Dist. Court, 102 P.3d 600, 605 (Nev. 2004) (the "substantially similar" requirement "allows medical experts to testify in medical malpractice cases where their present or former practice reasonably relates to that engaged in by the defendant at the time of the alleged professional negligence. . . . [T]he statute does not require that the affiant practice in the same area of medicine as the defendant.").

---

[4] Defendants' motion does not object to the testimony by Dr. Palmer regarding whether Defendants' actions met the standard of care; therefore, the Court does not address this testimony.

Second, Defendants argue that Plaintiff cannot demonstrate that Carrion's use of Probenecid and NSAIDs caused his death because there is no evidence of how many pills Carrion actually took and because Plaintiff disposed of her husband's Probenecid pill bottles after his death. The Court also rejects this argument. Plaintiff admits that after taking her husband's medications to her counsel's office to be photographed, she disposed of some of the medications, including Carrion's Probenecid and ibuprofen. However, the Court finds that there is sufficient evidence in the record—including Carrion's medical records, Plaintiff's deposition testimony, the affidavit of Plaintiff's counsel, and the pictures of certain pill bottles taken by Dr. Dodge's counsel—from which a reasonable jury could conclude that Carrion was taking his medications as prescribed.

Finally, Defendants argue that Plaintiff cannot demonstrate through any scientifically valid method that Carrion's use of Probenecid and NSAIDs caused him harm. As discussed above, the Court finds that Plaintiff has presented sufficient expert medical evidence to create a question of fact as to whether Defendants' actions breached the standard of care and reduced a substantial chance of a more favorable recovery by Carrion.

Based on the foregoing analysis, the Court denies Defendants' Motion for Summary Judgment.

V.   CONCLUSION

For the reasons discussed above,

**IT IS ORDERED** that Defendant United States of America's Motion in Limine (ECF No. 42) is DENIED.

**IT IS FURTHER ORDERED** that Defendant William Dodge's Motion for Summary Judgment (ECF No. 44) is DENIED.

**DATED**: <u>July 28, 2016</u>.

_____
**RICHARD F. BOULWARE, II**
**United States District Judge**